UNITED STATES of America,
Appellant,

v.

ALLAN DRUG CORPORATION,
Appellee (two cases).

Nos. 7914, 7915.

United States Court of Appeals
Tenth Circuit.

Feb. 18, 1966.

Rehearing Denied April 29, 1966.

Seth, Circuit Judge, dissented.

Arthur A. Dickerman, Atty., U. S. Dept. of Health, Education and Welfare (Lawrence M. Henry, U. S. Atty., and David I. Shedroff, Asst. U. S. Atty., with him on brief), for appellant.

Robert D. Inman, of Kelley, Inman, Flynn & Coffee, Denver, Colo. (Frank E. Gettleman, of Gettleman & Gettleman, Chicago, Ill., with him on brief), for appellee.

Before MURRAH, Chief Judge, and PICKETT and SETH, Circuit Judges.

MURRAH, Chief Judge.

In this consolidated libel action [1] the Colorado District Court condemned as misbranded [2] a drug labeled "Halsion, A Plan of Medication and Care for Acne and Pimples" and returned the seized articles to the intervening claimant to be brought into compliance with the drug law under the supervision of a representative of the Secretary of Health, Education and Welfare.[3] This appeal is from an order of the court approving the relabeling and authorizing the marketing of the product as relabeled over the protest of the Federal Food, Drug and Cosmetic Administration.[4]

The factual issues as framed in the pre-trial order were (1) Was the Halsion Plan an adequate and effective treatment for acne and pimples; (2) Was there unanimity of opinion as to the proven value of the plan; (3) Did other remedies provide a temporary mask for skin disorders while the Halsion Plan provided lasting relief; (4) Did the Halsion tablets represent a new type of internal medication and, in conjunction with the plan, a scientific breakthrough in the treatment of acne and pimples; and finally, as a matter of law was the labeling misleading in any particular and, if so, misbranded within the meaning of § 352(a) thus subject to condemnation under § 334(d)? The claimant denies that the Halsion Plan labeling created any false or misleading impressions.

On trial of the case the Court found "That the labeling material in its net effect represented to prospective purchasers * * * that the 'Halsion Plan' in and of itself is an adequate and effective treatment for acne and pimples and would give lasting relief from these conditions; that the medical profession unanimously recognizes that the 'Halsion Plan', with the exception of the Halsion pills, has proven value as an adequate and effective treatment for acne and pimples, and that the Halsion pills are 'a revolutionary new vitamin formula for internal medication' in the treatment of acne and pimples." The Court further found that "These representations were misleading in the following respects: (a) The 'Halsion Plan' in and of itself is not an adequate and effective remedy for the treatment for acne and pimples. (b) There is not a unanimity of opinion in the medical profession as to the proven value of the 'Halsion Plan', either including or excluding the taking of the Halsion pills, as an effective treatment for acne and pimples. (c) Neither the Halsion Plan nor the Halsion pills consist of 'a revolutionary new vitamin formula for internal medication' in the treatment of acne and pimples. Vitamins are prescribed

---

1. The Colorado suit seized for condemnation the drug in capsule form. The California suit was brought to condemn tablets of the same composition. The California suit was transferred to Colorado for purposes of trial.

2. 21 U.S.C. § 352(a).

3. § 334(d) reads in pertinent part as follows: " * * * the court may by order direct that such article be delivered to the owner thereof to be destroyed or brought into compliance with the provisions of this chapter under the supervision of an officer or employee duly designated by the Secretary * * *."

4. The capsules were ordered destroyed and only the tablets as relabeled are involved.

by some members of the medical profession as a part of the treatment for acne and pimples. The use of vitamins for this purpose began about thirty years ago." The Court found, however, that the Halsion Plan " * * * may be of some benefit in mild cases of acne and pimples, and the measures prescribed in the Plan are used by some members of the medical profession, in whole or in part, in conjunction with other measures and treatments which the physician may deem to be indicated." [5] It was accordingly concluded as a matter of law that the labeling was misbranded within the meaning of § 352(a).

Amenable to the requirements of § 334(d), the order returning the seized articles for relabeling expressly provided that "The Claimant shall not sell or dispose of said articles or any part thereof in a manner contrary to the provisions of the Federal Food, Drug, and Cosmetic Act * * * ". The Court expressly retained jurisdiction for further orders deemed necessary to properly dispose of the proceedings and further provided that if by a certain date the claimant and the Secretary " * * * have not resolved the manner in which relabeling shall be accomplished * * * ", the Claimant may move for an order regarding the labeling to be applied.

The Secretary's representatives and the claimant were unable to agree on the manner of relabeling. The claimant proposed to bring the condemned labeling within compliance in the following manner: "(1) The present bottle labels will be left intact and unchanged; (2) The present cartons will be left intact and unchanged; (3) All other labelling, other than advertising, introduced in the trial of the case will be destroyed. By this we mean the inserts used in both the retail and mail order packaging and all brochures now existing; (4) In lieu of the inserts in use at the time of the seizures the claimant will use an insert containing the information set forth in the exhibit attached to this letter." [6]

---

5. In the oral colloquy concerning the terms of the condemnation decree the Court expressed the informal view that the "labeling material went too far in its claims". The Court seemed to think the labeling would not have been false or misleading if, for example, it had stated " * * * this product may be of value or may be helpful in the treatment of mild cases of acne"; if they had eliminated the claim " * * * that this is a new and revolutionary product * * *." The Court's principal concern was " * * * that the labeling material gave the impression that this in itself was a complete treatment for all types of acne and pimples, and obviously from the testimony this was not true."

6. The exhibit depicted a teenaged boy and girl and sketches of labeled containers. The insert read in pertinent part as follows: "Halsion Tablets have been scientifically formulated to help treat acne vulgaris of the comedone variety and are to be used in conjunction with the recommended dietary and hygienic procedures specified in the complete Halsion Plan. * * * It is with great pleasure that the Allan Drug Corporation introduces the Halsion Plan for the management and care of acne, pimples, blackheads and oily skin. The Halsion Plan consists of a program of hygienic, dietary and constitutional procedures recommended by many physicians plus a vitamin supplement in tablet form.
"The Halsion Plan
&ast;  &ast;  &ast;  &ast;  &ast;
"The Allan Drug Corporation suggests that the entire Halsion Plan be followed with regularity unless otherwise directed by your physician.
"1. Wash your face three times a day with a mild soap or soapless cleanser. Work up a rich abundant lather with hot water, gently massage the lather into your skin. Rinse thoroughly first with hot water, then with cold. Dry briskly with a clean towel.
"2. Greasy skin creams, oils or ointments should be avoided unless specifically recommended by your physician.
"3. Girls should use light make up only. Always apply face powder with a clean puff or cotton ball.
"4. Refrain from picking or squeezing pimples. Not only can this hinder the healing process, but it could spread the infection and possibly lead to permanent scarring.
"5. Dandruff has been known to aggravate an acne condition. Maintain a clean scalp. Use a good medicated shampoo and scalp conditioner.
"6. Eat a balanced diet. Avoid greasy or highly spiced foods and concentrated

In a letter responding to the proposed relabeling the Secretary took the position that the labeling did not comply with the Court's guidelines in that (1) There was no qualification of the statement "Halsion, A Plan of Medication and Care for Acne and Pimples" and that a revision should be made to include the concept that the tablets constitute only one part of a plan and that at most "The plan may be helpful only in mild cases of acne and pimples." (2) The use of the fanciful name Halsion and the featuring of inactive ingredients on the labeling creates a misleading impression that the product is of "unique effectiveness". See 21 C.F.R. 1.104(c) (3). (3) The labeling should plainly state that Halsion is a vitamin supplement and nothing else. (4) The reference to Halsion tablets as scientifically formulated is not supported by any evidence and the ordinary purchaser would not understand what is meant by acne of the comedone variety. The Secretary also objected as not in conformity with the Court's guidelines to the proposed leading statement: "It is with great pleasure that the Allan Drug Corporation introduces the Halsion Plan for the management and care of acne, pimples, blackheads and oily skin. The Halsion Plan consists of a program of hygienic, dietary and constitutional procedures recommended by many physicians plus a vitamin supplement in tablet form." He took the position that in view of the order of the court reading on § 334(d) to the effect that the claimant shall not sell or dispose of the article in a manner contrary to the provisions of the Act, it was necessary to evaluate the labeling in the light of all of the provisions of the Act, including § 352(f) (1) re adequate directions of use. See also 21 C.F.R. 1.106 (a), (o). Finally, the Secretary took the position that the requirements of § 334(d) made it necessary to consider the marketing status of the Halsion tablets under the Drug Amendments of 1962, 52 Stat. 1041. In that regard the Secretary contended that having shown to the satisfaction of the Court that the drug was not generally recognized by experts as effective for its intended uses, it cannot now be legally marketed unless its effectiveness has been established pursuant to a "New Drug application" in accordance with the statutory procedure set forth in 21 U.S.C. § 355(a), (b).[7]

---

sweets. Many doctors discourage the eating of chocolate, nuts, iodized salt and cola drinks.

"7. Avoid constipation, upset stomach and indigestion.

"8. See your doctor and dentist regularly. Infections, such as those of tonsils or teeth, should receive prompt attention.

"9. Take two Halsion tablets daily, one in the morning and one in the evening, before or after meals or as prescribed by your physician. Do not exceed dosage.

"10. Get lots of sleep, plenty of sunshine, and exercise and drink plenty of water.

"Important: It must be remembered that the taking of Halsion tablets alone is not enough, you must follow the entire Halsion Plan regularly to achieve the satisfaction you desire.

"It is important to remember there are no wonder drugs or miracle cures for teen-age acne, but by following the Halsion Plan regularly you may find relief from your present acne-pimple problems. By following these simple directions, acne and pimple blemishes may be controlled, and quite possibly permanent damage can be avoided. Always remember that ordinarily a condition that has existed for a long time should not be expected to be relieved over night, however, because individual experiences may vary, the Halsion Plan is sold on a money-back guarantee. Every Halsion Plan customer must be perfectly satisfied, or his or her entire purchase price will be promptly refunded. * * *"

7. § 355(a) provides: "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) of this section is effective with respect to such drug." Subsection (b) provides in material part that "Any person may file with the Secretary an application with respect to any drug subject to the provisions of subsection (a) of this section. Such person shall submit to the Secretary as a part of the application (1) full reports of investigations which have been made to show whether or not such drug is safe

Being thus unable to agree on the re-labeling, the claimant moved in accordance with the intermediate order for final approval of its proposed relabeling as " * * * truthful and * * * accurate in every detail * * * " and as in conformity with the guidelines and the Drug Act as amended. The Secretary thereupon responded to join the issues by asserting in affidavit form the same position he had taken in conference and in the supervisory letter.

Upon consideration of the motion for approval of the proposed labeling, the Court was first of the opinion that the product may be relabeled and dispensed without compliance with the "New Drug" requirements of the 1962 Amendments, i. e. § 321(p) (1) and § 355(a), (b). On the matter of compliance with its order, the Court approved the bottle and carton labeling, but revised the proposed inserts in some significant respects.[8]

On appeal the Secretary takes sharp issue with the bottle and carton labels as approved by the Court contending that the unqualified words

## HALSION
A Plan of Medication and Care for

### ACNE/PIMPLES

conveys the impression to prospective purchasers, especially pathetically eager and impressionable teenagers that the Halsion Plan is adequate and effective as a remedy for acne and pimples; that such intimation is inconsistent with the conclusive findings of the Court that " * * * at most the Halsion Plan may be of some benefit in mild cases of acne and pimples". He has also reasserted his position with respect to the market

status of the drug in view of the 1962 Amendments to § 321(p) (1) and § 355.

For reasons we shall attempt to demonstrate we are of the considered opinion that when, based on the facts, the trial court held the Halsion labeling false and misleading, hence misbranded, it became a "new drug" within the meaning of § 321(p) (1), as amended, and was subject to the administrative procedures prescribed in § 355 as amended. In this posture of the case we have no occasion to decide whether the approved relabeling complied with the orders of the Court or the Federal Drug Act. The procedures under § 355 became an administrative matter in the first instance.

Prior to the 1962 Amendments, § 321(p) (1) defined a "new drug" subject to the new drug procedures prescribed in § 355 as "Any drug the composition of which is such that such drug is not generally recognized, among experts * * * as safe for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a 'new drug' if at any time prior to the enactment of this chapter it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use." The 1962 Amendment simply added the words "and effectiveness" after the word "safety" and the words "and effective" after the word "safe". The exception or the Grandfather Clause was perpetuated verbatim so that a drug not generally recognized as safe or effective on the date of the Amendment would not be deemed to be a new drug on that date if its labeling

for use and whether such drug is effective in use; * * * "

8. The proposed insert was revised to eliminate the words "to help treat vulgaries of the comedone variety" so that the insert read "Halsion Tablets have been formulated to help treat mild cases of acne, pimples and are to be used in conjunction with the recommended dietary and hygienic procedures specified in the complete Halsion Plan. * * * " The insert

was also revised to add "mild cases" in the lead statement to read, "It is with great pleasure that the Allan Drug corporation introduces the HALSION PLAN for the management and care of mild cases of acne, pimples, blackheads and oily skin. * * * " There were other minor or insignificant changes in the language to describe the plan. See and compare Footnote 6 for claimant's proposed labeling.

contained the same representations concerning the conditions of its use. Additionally, and under another and different section of the amending Act [107(c) (4)] pertaining to the effective dates of the Amendments, the Grandfather Clause was restated, "In the case of any drug which, on the day immediately preceding the enactment date (A) was commercially used or sold in the United States * * * the amendments to section 201(p) * * * shall not apply to such drug when intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day." While the exempting language of the basic Act and the Amendment is verbally different, they are undoubtedly intended to mean the same thing.

■ Thus, as we understand the legislative scheme as amended, any drug the composition of which was not generally recognized as safe and effective under conditions recommended in its labeling was a "new drug" subject to administrative procedures prescribed in § 355, except such drug was not to be deemed to be a new drug and the Amendments did not apply if the drug was intended solely for use under conditions prescribed and recommended in its labeling on the enactment date.

Soon after the 1962 Amendments, the Secretary promulgated an administrative summary in which he stated generally that safety and effectiveness of marketed drugs was the primary objective of the legislation and that it "provides new means for assuring the attainment of these objectives". Under the heading "Transitional provisions for drugs already on the market at the time of enactment", the Secretary stated in part, "As to drugs already on the market that have never been subject to the new-drug procedure but are not generally recognized as effective, the burden remains on the Government to prove in court, insofar as unchanged labeling claims are concerned, that they do not have their claimed effect. If the labeling claims

are changed, however, these must be approved under the new-drug procedure."

The trial court construed the critical words "solely for use under conditions prescribed, recommended, or suggested in labeling" to mean that the Amendments should apply to a new or different area of use under conditions prescribed in the labeling. He did not think Congress intended the Amendments to apply to a mere change in the labeling after the effective date of the Act, thus imposing upon a drug manufacturer the onerous burden of the new drug procedures when, as in this case, the effect of the change in the labeling was merely to reduce the use of the drug under conditions prescribed or recommended in the labeling.

We start with the proposition that a new drug within the meaning of the Amendment is any drug the composition of which is not generally recognized as effective for use under conditions prescribed, recommended or suggested and that in our case the Secretary has proven to the satisfaction of the Court that this drug was not effective for use under conditions recommended in its labeling. It is plain, therefore, that Halsion is a new drug subject to § 355 unless on the amendment date its labeling contained the same representations concerning conditions of its use, or otherwise stated, the drug was intended solely for use under conditions recommended in the labeling on the effective date.

■ Since we are dealing with a Grandfather Clause exception, we must construe it strictly against one who invokes it. See Spokane & Inland Empire Railroad Co. v. United States, 241 U.S. 344, 350, 36 S.Ct. 668, 60 L.Ed. 1037; McCauley v. Makah Indian Tribe, 9 Cir., 128 F.2d 867, 869–870; 4 A.L.R.2d § 1, p. 670; 50 Am.Jur. 451, Statutes § 431. Then too, as we know, where Congress has empowered an administrative agency to " * * * initially apply a broad statutory term to a particular situation, our function is limited to determining whether the Commission's deci-

sion * * * " is warranted in the record and supported in law. See Atlantic Refining Company v. Federal Trade Commission, 381 U.S. 357, 367, 85 S.Ct. 1498, 14 L.Ed.2d 443; United States v. Southwest Potash Corporation, et al., 10 Cir., 352 F.2d 113. The trial court has a wide discretion in determining whether an article condemned under § 352 may be delivered to an intervening claimant under § 334(d) to be brought within compliance with the Drug Laws under the supervision of the Secretary or his delegate. See Gellman, et al. v. United States, 8 Cir., 159 F.2d 881; 338 Cartons * * * of Butter, et al. v. United States, 4 Cir., 165 F.2d 728; Research Laboratories v. United States, 9 Cir., 167 F.2d 410. But, see United States v. 716 Cases * * * Del Comida Brand Tomatoes, 10 Cir., 179 F.2d 174, in which we reversed the trial court. But, the question whether an article condemned for its false and misleading labeling has been brought within compliance of the Act is a different matter altogether. As to that, the supervisory powers committed to the Secretary undoubtedly carry broad authority to determine whether and in what manner the labeling may be brought within compliance with the act. The judicial function is concerned with the end product of the labeling process. While the final decision lies with the courts, great weight must be given to the administrative decision.

We are concerned with a condemned article, condemned because of false and misleading labeling. In determining the ultimate question whether the condemned product shall be reintroduced into commerce, we look at the fundamental purpose of the Amendments to tighten administrative control and close up loopholes to the end that the labeling on products affecting the public health and safety shall speak the truth in language that the unsuspecting purchaser can understand. See United States v. 250 Jars Cal's Tupelo Blossom U. S. Fancy Pure Honey, 6 Cir., 344 F.2d 288; United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48. The history of this legislation leaves no doubt of its salutary purpose to effect a change in the concept of labeling and the procedures for bringing mislabeled products into compliance. Even before the Amendment to § 321(p) (1), proof to the satisfaction of the court in a libel action that a drug was not generally recognized as safe brought the seized articles clearly within the statutory definition of a "new drug". United States v. 354 Bulk Cartons * * * Trim * * * Cigarettes, D.C., 178 F.Supp. 847; Merritt Corp. v. Folsom, D.C., 165 F.Supp. 418.

■■ Judged in this context, we construe the critical language of the Grandfather Clauses to exempt drugs not generally recognized as effective if on the effective date of the Act the labeling contained the same representations concerning its use, and thus confine the exemptions to drugs intended solely for use under conditions prescribed on the effective date of the Act.[9] Given this interpretation, the condemned article loses the immunity of the Grandfather Clause and becomes a new drug subject to § 355. This is not to say that every change in labeling must necessarily result in the manufacturer filing a new drug application to reintroduce the article into interstate commerce. It may well be that a condemned drug may be brought into compliance with the provisions of the Drug Act under the supervision of the Secretary by relabeling the article for another use for which it is generally recognized as effective, i. e. see Merritt Corp. v. Folsom, supra, where it was held that the article was a new drug even though it may not have been such if recommended for use in another disease. But, we need not speculate on the effective uses for which this article may be

9. See explanation following § 321(p), Pocket Supplement, pp. 52–53, which states, "Thirdly, in the case of a drug on the market which was never subject to the new-drug procedure before, the amendments to the new-drug definition relating to drug effectiveness would not apply to existing labeling claims."

properly relabeled. It is enough to say that where, as here, an article has been condemned as mislabeled in fact and misbranded in law, it can be brought into compliance and reintroduced for the same or similar use only as a new drug under the procedures prescribed in § 355.

Judgment is reversed, and the case is remanded with directions to proceed accordingly.

SETH, Circuit Judge (dissenting).

I differ with the conclusion reached by the majority, and feel constrained to express a contrary view in the following opinion:

The Food, Drug and Cosmetic Act of 1938 (21 U.S.C. §§ 301 and following) makes express provision that after condemnation of a drug the court may, upon the claimant furnishing bond, order that the drug be delivered to the owner to be brought into compliance with the provisions of the Act. This compliance is to be under the supervision of an employee of the Administration (21 U.S.C. § 334(d)). This procedure is intended by Congress to be used by the courts when in their discretion a salvage of the drug is possible through some change in the product or label. The Act contemplates that the court enter an order requiring such action to be taken.

The law thus provides for what is commonly referred to as a salvage of the condemned drug. This is a remedy available to the claimant in judicial proceedings which are then pending when the court in the exercise of its discretion determines that salvage is proper. This is an important and much used provision of the Act, vesting in the courts the post-condemnation authority over destruction or salvage. This exists independently of any administrative functions of the agency.

The Government here seeks to eliminate this judicial remedy through its construction of other sections of the Act which were amended in 1962. The provision for salvage has been in effect since at least 1938, and the section providing for it was not amended in 1962.

The trial court in the instant case used the statutory salvage authority and set up guidelines for relabeling the product under agency supervision and cooperation. There was no finding nor real contention that the drug in question was in any way harmful, dangerous, or adulterated. Instead it simply did not live up to the claims made in its labeling as to its effectiveness, but was found by the court to be effective in certain circumstances.

The appellee pursuant to the court's order in conferences with the agency made proposals for changes in labeling to bring the drug into compliance. The agency replied to the proposals in some detail, refusing to agree, but concluded by saying: "However, because the Court found that the article was misbranded * * * thus rendering relabeling necessary, we believe that the 'grandfather clause' no longer applies, this for the reason that under any revised labeling, the product would no longer be intended 'solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug' on October 9, 1962, which is the cut-off date under the 'grandfather clause' exception."

Thus apparently no relabeling was possible with the cooperation of the Food and Drug Administration because it relied on its legal opinion, expressed above, to the effect that under *no revised labeling* could the product be marketed under the salvage provisions of the Act. Thus the trial court entered an order for relabeling. This action the Government now says constituted an overruling of "the administrative determinations and substituted those of the Court." It is difficult to see how this argument could be made in view of the fact that the administrative determination was in reality one of law, and the court substituted its opinion. The Government in its brief discusses at length the agency's functions in salvage proceedings, but again this has little significance when it took the position that no salvage was

possible under its construction of the Act.

The 1962 amendments to 21 U.S.C. § 321(p) (1) and § 355 brought about substantial changes in the scope of these certain sections of the statute, especially in relation to the definition of new drugs. Where the law had theretofore applied to drugs not generally recognized as "safe," it was extended by the addition of words "and effective" or "and effectiveness" after the words "safe" or "safety" to include the matter of whether the drug was efficacious. Upon such an issue the burden of persuasion and time expended to persuade became particularly important, as is demonstrated by the position taken by the parties in this case. The Government would have the appellee drug company climb the administrative vine from the bottom, while appellee, having lost the libel portion of the case, sought instead and obtained the judicial salvage remedy under 21 U.S.C. § 334(d) in the court where the proceedings were already pending.

If we confine our analysis to the 1962 amendments and especially as they changed the section defining a "new drug" (21 U.S.C.A. § 321(p) (1)), the logic of the Government's argument is persuasive. Under Section 321(p) (1), a drug *not* recognized as effective is *not* a "new drug" if among other things its labeling prior to the amendment date " * * * contained the same representations concerning the conditions of its use" as at the time in question. A drug is thereby possibly confined to the exact labeling used on the effective date of the amendment of 1962, and if any deviations thereafter occur or are required, the drug may automatically become a "new drug." Thus under the Government's argument the appellee's labeling claims were found by the trial court to be false, a change was necessary; and therefore, it was not, or would not be, as labeled on the effective date of the amendment of 1962; therefore, it was a "new drug"; therefore, administrative application under § 355 was required and appellee was thus required to start anew

the administrative procedure to qualify to sell at all.

When this analysis is followed, it is to entirely ignore 21 U.S.C. § 334(d), above described, and to assume that it has been rendered ineffective as to this case by the amendment of other sections. It is difficult to see how it could have been so changed when nothing in the legislative history indicates any intention to eliminate a judicial remedy under the circumstances of this case. H.R. Rep. No. 2464, 87th Cong., 2d Sess.; Cong.Record Senate, August 23, 1962, p. 16305, note following 21 U.S.C.A. § 321.

The construction urged also prevents any maker of a drug, presently under the grandfather clause, from changing the label to even reduce the claim of effectiveness should new information become available or for any other good reason a change to conform to the facts should be made. It would seem that the purpose of the Act is to encourage label corrections rather than to discourage them.

Instead a construction of the 1962 amendments should be adopted which preserves the remedies in the portions of the Act not amended and not intended to be changed. The trial court did this under a construction which generally considers the words, "conditions of use," in 21 U.S.C. § 321(p) (1) as used in the Act to refer to the general purposes for which the drug is to be used, and not to specific claims of effectiveness. Thus there was no change in the case at bar as to "conditions of use."

On this point the case of Merritt Corp. v. Folsom, D.C., 165 F.Supp. 418, cited by the Government, shows the position of the Food and Drug Administration under the old wording relating to "safe." There the question was the application of an old drug preparation to a new use or new disease. It was held that the new use made it a new drug for that purpose. This was a new "condition of use" as above described. The Government refers also to the case of United States v. 354 Bulk Cartons * * * Trim Reducing-Aid Cigarettes, D.C., 178

F.Supp. 847, where the real question was whether the cigarettes were a drug, the claimant contending they were not. The court found they were a drug and hence by the same finding they had to be new since claimant had not maintained they were a drug at all. These two cases, in my opinion, do not hold that under the old section an unsafe drug has been held to be a "new drug," nor is there authority that an ineffective drug is a "new drug."

Instead of the trial court's view, which has much to recommend it, I would construe 21 U.S.C. § 334 relating to judicial salvage orders as not being inferentially limited by the amendment of 1962 to 21 U.S.C. § 321(p) (1) relating to the definition of new drugs. I would hold that involuntary label changes are not contemplated by Section 321(p) (1) when ordered as a part of a court's salvage decision and order. Such changes cannot be those contemplated in the new drug definition simply because no intention appears to eliminate judicial salvage in situations such as the one before us. If the contention of the Food and Drug Administration is adopted, the United States District Court when it has exercised its discretion to order salvage, as here by relabeling, thereby loses jurisdiction to proceed under the statute. The salvage is thereby thwarted. Or if the Government's view is adopted, it may be said that the court's order to relabel is then subject to administrative review by the requirement that the claimant start anew through administrative channels. In either view the statutory judicial remedy is eliminated.

A construction should be followed which would give effect to both sections; and this may be done, as above described, by construing Section 321(p) (1) as not applicable to involuntary relabeling as part of the court's salvage order. This is entirely reasonable and proper, and would carry out the intentions of the Act and also preserve the intended relationship between judicial and administrative functions.

I would affirm.