**UNITED STATES of America**

v.

**ARTICLES OF DRUG LABELED in part "QUICK-O-VER".**

**Civ. No. 17849.**

United States District Court
D. Maryland.

Oct. 20, 1967.

Thomas J. Kenney, U. S. Atty., Fred K. Grant, Asst. U. S. Atty., Baltimore, Md., and Joseph J. D'Erasmo, Trial Atty., Food and Drug Administration, Washington, D. C., for the United States.

Arnold M. Weiner, Baltimore, Md., for claimant, Locke Chemical Co.

THOMSEN, Chief Judge.

"Quick-O-ver for Hang-O-ver" is such a catchy slogan that Locke Chemical Company, licensee of the trademark and claimant herein, is anxious to put out some sort of compound which can be distributed nationally using that slogan.

Its first product was the subject of a complaint for forfeiture under the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq., filed herein by the government in May 1966. For reasons which are not important in the present case, the parties agreed, with the approval of the court, that the shipment involved in this case, Civil No. 17301, should be condemned without prejudice to claimant's right to raise all appropriate questions in a later case.

Thereupon, in November 1966, claimant shipped in interstate commerce four test shipments, the first of which was the same compound involved in Civil No. 17301, but with a new label containing a different recommended dosage. The other three shipments contained variations of the preparation, which will be discussed below. The government was notified of the shipments, the present complaint for forfeiture, Civil No. 17849, was filed, the Marshal served the warrant, and the articles are now under the jurisdiction of this Court.

### The Statute

The government contends that each variation of the preparation is a "new drug", as that term is defined in 21 U.S.C.A. § 321(p), which has been shipped in interstate commerce in violation of section 355(a),[1] since "no approval of an application filed pursuant to subsection (b) is effective with respect to such drug", and, therefore, it is subject to seizure and condemnation under section 334(a).

Section 321(p), as amended in 1962, defines the term "new drug" for the purposes of the Federal Food, Drug and Cosmetic Act:

"(p) The term 'new drug' means—

"(1) Any drug the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a 'new drug' if at any time prior to the enactment of this chapter it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use; or

"(2) Any drug the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions."

### The Issue

■ Whether each of the four variations is a "new drug" as defined in section 321(p) (1) is the only issue in the case.[2] It has been stipulated that the drugs involved have been shipped in interstate commerce and that no new drug application for any of the variations of Quickover involved has been submitted or approved pursuant to 21 U.S.C.A. § 355. Claimant concedes that it is not entitled to the benefit of the grandfather clause, even with respect to the first variation, in view of the change in the label.

■ In such a case as this, the court does not decide whether the drug is safe and effective; the court lacks the necessary expertise to make that decision. Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); Tutoki v. Celebrezze, 375 F.2d 105 (7 Cir., 1967). The question which this court must decide in this case, with

1. All section references herein, unless otherwise indicated, are to sections of 21 U.S.C.A.

2. The statutory definition of the phrase "new drug" controls this case, regardless of any other meaning attributable to the phrase or to the word "new" by common understanding or other authority. United States v. 62 Cases * * * Jam, 340 U.S. 593, 71 S.Ct. 515, 95 L.Ed. 566 (1950); Western Union Telegraph Company v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414 (1944).

respect to each variation, is whether the government has shown by a preponderance of the evidence that the "drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof".[3]

### The Variations of the Drug

Each of the variations of Quickover is contained in plastic vials mounted upon a grey display card for over-the-counter sale. The card bears a comic caricature of a man with heavy eyelids, and the phrase

Quick.O.ver
for
Hang.O.ver

Immediately beneath that phrase, the following specification or qualification appears:

to Relieve

.

HEADACHE

.

NAUSEA

.

UPSET
STOMACH

.

LACK OF
ALERTNESS

Each of the vials contains a label which states:

QUICKOVER

For relief of headache, nausea, upset stomach and lack of alertness.

The ingredients which comprise each variation are contained in two capsules, one blue and the other red-white. The vials are in two sizes, some containing a single dose and others three doses. The directions for taking the drug are the same for each variation, viz.:

"Take one blue and one red-white capsule *immediately after awakening*. Re-

peat in four hours ONLY if necessary. Do not take more than three doses in twenty-four hours."

The labels also contain certain standard warnings, set out below, which vary with the changes in the formulations.

Variation #1 is the original formulation of Quickover; it differs from the items in the first case only in changes which have been made in the labeling. Variation #1 contains the following ingredients in the following amounts:

*RED AND WHITE CAPSULE*

Aspirin—414 mg. or 6.38 gr.

Caffeine—65 mg. or 1 gr.

Aluminum Hydroxide Gel. 130 mg. or 2 gr.

*BLUE CAPSULE*

Phenacetin—325 mg. or 5 gr.

Ephedrine Sulphate—24 mg. or $\frac{3}{8}$ gr.

Magnesium Trisilicate—65 mg. or 1 gr.

Magnesium Carbonate—65 mg. or 1 gr.

Nicotinamide—$12\frac{1}{2}$ mg. or $\frac{1}{5}$ gr.

Thiamine Hydrochloride—5 mg. or $\frac{1}{13}$ gr.

Peppermint Oil—.3 millileter or $\frac{1}{2}$ minum

Three warnings appear on the label. The first is "Keep out of reach of children". The second warns the user not to take more than the recommended dosage or for longer than ten days without consulting a physican. This is the standard warning for over-the-counter preparations containing phenacetin. 21 C.F.R. section 3.37. The third is the standard warning for over-the-counter preparations containing ephedrine sulphate, usually referred to as ephedrine. It warns that the product should not be used if high blood pressure, heart or thyroid disease, or diabetes is present, or if the pro-

---

**3.** In considering cases arising before the 1962 amendment to section 321(p), it should be noted that before 1962 the only question was whether the drug was generally recognized as safe. Now, the question is whether it is generally recognized as both safe and effective.

spective user is nervous, restless, or sleepless. 21 C.F.R., section 131.15.

The three other variations were made in anticipation of objections by the F.D.A. to the phenacetin or ephedrine or both.

The formula for variation #2 differs from the first in one respect. The ephedrine has been replaced by an additional 130 mg. of caffeine, bringing the total caffeine to 195 mg. The ephedrine warning has been deleted as unnecessary, but the phenacetin warning remains.

Variation #3 likewise differs from the first in only one respect. The phenacetin has been removed and 325 mg. of acetaminophen has been substituted for it. Since this variation contains ephedrine, the ephedrine warning remains on the label, but the phenacetin warning has been removed, and the following warning has been added: "Do not take more than the recommended dosage, and, if symptoms persist, consult your physician".

In variation #4 both ephedrine and phenacetin have been removed, and replaced respectively by 130 mg. of caffeine and 325 mg. of acetaminophen. The substitutions make the two standard warnings unnecessary, but the label for variation #4 contains the following warning, in very small print: "Do not take more than the recommended dosage, and, if symptoms persist, consult your physician".

### Other Facts

In 1959, Dr. Charles H. Grogan, a biochemist engaged in research and drug development at the National Institute of Health, and Dr. Leonard Rice, a professor of pharmaceutical chemistry at Howard University, undertook a review of the literature with respect to the symptoms of hangover and, aided by a Baltimore pharmacist, Irving Freed, president of claimant, Locke Chemical Company, arrived at a mixture which they named Quickover for Hangover.

That name was used in interstate commerce as early as February 1960; the trademark was registered on April 4, 1961. During the intervening years the trademark has been licensed to various concerns, including Locke, and approximately 300,000 vials of Quickover have been sold.

An application for a patent for Quickover was filed on September 7, 1961, but the Board of Patent Appeals rejected the application.[4]

At the trial the witnesses called by the respective parties included physicians, pharmacologists and the Director of Research of the Center of Alcoholic Studies at Rutgers University, formerly at Yale. There was little real conflict in their testimony, although they approached the issues from different points of view. The ultimate facts stated in the discussion below have been found after a consideration of all the evidence.

### Discussion

As noted above, the government must show, with respect to each variation of the drug, that the "drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recom-

---

4. The Board stated, *inter alia:* "All claims have been rejected as unpatentable over Fishbein, Stevans, the U. S. Dispensatory and Trulson considered together. These references establish that each of the ingredients of appellants' composition have been used to treat alcoholism or the symptoms of excess alcohol intake. In fact, several of the references, e. g., U. S. Dispensatory and Stevans, disclose the use of a combination of several of the claimed ingredients. For example, except for the antiacid, peppermint and the vitamins appellants' composition finds its exact counterpart on page 17 of the U. S. Dispensatory under 'analgesics' containing aspirin. It may further be noted that appellants' aspirin, phenacetin and caffeine merely represent the well known APC formula extensively employed to treat headaches, colds etc. The rejection is on the ground that there is nothing unobvious in combining these ingredients into a single composition in absence of any unobvious result."

mended or suggested in the labeling thereof".[5]

Section 321(m) states:

"(m) The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."

■ The display cards which bear the vials of Quickover are part of the labeling. The display cards and the labels themselves must be read through the eyes of a person of ordinary understanding, suffering from, or foreseeing the possibility that he will in the future be suffering from, the malady for which the drug is offered as a remedy. United States v. Vitamin Industries, Inc., 130 F.Supp. 755 (D.Neb., 1955).

The government argues and the court finds that that malady is a hangover, as clearly appears from the display cards. Locke argues that the labeling claims no more for Quickover than that it is a product for the relief of those hangover symptoms specified on the card and on the label, i. e., headache, nausea, upset stomach and lack of alertness. Those are the symptoms which are usually present in and constitute what a government witness called "an ordinary, garden-type variety hangover".[6] The dispute is therefore academic, unless the court accepts the government's further argument that the word hangover includes, and would be understood by the ordinary purchaser and user to include, the more serious aftereffects of prolonged drinking, of the sort engaged in principally by alcoholics.

The word hangover is not a medical term; it does not appear in any of the medical dictionaries readily available to the court. After consulting a number of general dictionaries, and considering all of the evidence in the case, the court finds that the term is commonly understood, as it is defined by the Random House Dictionary (1966), to mean "the disagreeable physical aftereffects of drunkenness, usually felt several hours afterward". Webster's more recent dictionaries refer specifically to headache and nausea as such aftereffects.

The evidence supports common experience that the aftereffects or symptoms usually clear up after about twelve hours, and that in the meantime they may be relieved by various remedies, including aspirin for the headache, coffee for the lack of alertness, and various specifics for the upset stomach. APC (aspirin, phenacetin and caffeine) is the remedy commonly prescribed by doctors and nurses in the armed forces.

The government has shown by a preponderance of the evidence that variations #1 and #3 are not generally recognized by qualified experts as safe for use under the conditions prescribed, recommended or suggested in the labeling, because ephedrine should not be taken by persons with high blood pressure, heart or thyroid disease, or diabetes. Many such persons with a hangover would not be disposed or able to read the warnings on the label, even if they were printed in much larger type.

The government has also shown that variation #2, which contains phenacetin, is not generally recognized as safe for such use, because of possible damage to the kidneys. The danger can be readily eliminated by substituting acetaminophen for phenacetin, as has been done in variation #4, without lessening the effectiveness of the product.

■ The government has failed to prove that variation #4 is not generally recognized by experts as safe and effective for such use.[7]

---

5. Section 321(p), quoted above.

6. Related symptoms of an ordinary hangover may include temporary tremor, nystagmus and vomiting.

7. The fact that there may have been some disagreement among the expert witnesses called with respect to the safety or efficacy of a particular drug for a particular purpose does not necessarily mean that the safety or efficacy of the drug for that purpose is not *generally* recognized among qualified experts. Cf. Merritt Corp. v. Folsom, 165 F.Supp.

The labeling does not claim that Quickover will "cure" a hangover; time and nature will usually work the cure. As we have seen, a hangover is essentially a set of symptoms. What the labeling claims is that Quickover will relieve the usual set of symptoms. The court finds that qualified experts generally agree that the ingredients of variation #4 will relieve the usual symptoms. It is not necessary that the witnesses have heard the particular combination discussed. The witnesses are agreed that the aspirin and acetaminophen in variation #4 will relieve headache; the antacids, aluminum hydroxide gel, magnesium trisilicate and magnesium carbonate, will neutralize or decrease gastric acidity, and thus alleviate nausea or upset stomach following an evening of drinking; the peppermint oil will help get rid of gas; the caffeine will help restore alertness, and the vitamins, nicotinamide (or niacinamide) and thiamine hydrochloride, will help a little. Together they will help relieve the usual symptoms constituting a hangover. No more is claimed.

■ With respect to safety, the government does not contend that the ingredients of variation #4 are dangerous separately or in combination. Its only argument on this point is that since the drug may relieve headache, nausea and upset stomach, and help restore some measure of alertness, it may prevent persons from consulting a doctor even though they have serious aftereffects as a result of alcoholism or prolonged excessive drinking. The same argument could be made against any over-the-counter remedy which relieves pain or a cough, but does not undertake to cure the cause of such pain or cough. It is not a ground for finding such a drug as this unsafe, especially since variation #4

carries the warning: "Do not take more than the recommended dosage, and, if symptoms persist, consult your physician".[8] Quickover is not offered as a cure for alcoholism, nor as a remedy for delirium tremens and other results of prolonged and heavy drinking.

■ The Court concludes that variations #1, #2 and #3 should be condemned, but that variation #4 should not be condemned, subject to the reservation in footnote 8, above. Counsel will prepare an appropriate judgment order.

---

418 (D.D.C., 1958); United States v. 354 Bulk Cartons Trim Reducing Aid Cigarettes, 178 F.Supp. 847 (D.N.J., 1959). That is a question of fact as to which experts in the field may testify. United States v. Wood, 226 F.2d 924 (4 Cir., 1955).

8. The court finds that the type used for the warning in variation #4 is too small. Section 352(c), 21 C.F.R. 131.10. The court will condition its order denying forfeiture of variation #4 upon the substitution of a label carrying the warning in larger type to be approved by the court.