UNITED STATES of America, Plaintiff, Appellant,

v.

ARTICLES OF DRUG CONSISTING OF the FOLLOWING: 5,906 BOXES, etc., Defendants, Appellees.

UNITED STATES of America, Plaintiff, Appellant,

v.

ALCON LABORATORIES (PUERTO RICO), INC., et al., Defendants, Appellees.

Nos. 83–1691, 83–1693 to 83–1695 and 83–1692.

United States Court of Appeals, First Circuit.

Argued June 4, 1984.

Decided Sept. 28, 1984.

---

106

Randy S. Chartash, Attorney, Washington, D.C., with whom J. Patrick Glynn, Atty., Civ. Div., Dept. of Justice, Richard K. Willard, Acting Asst. Atty. Gen., Washington, · D.C., Daniel Lopez-Romo, U.S. Atty., Gary H. Montilla, Asst. U.S. Atty., Hato Rey, P.R., Thomas Scarlett, Chief Counsel, Forrest T. Patterson, and Arthur Y. Tsien, Associate Chief Counsels for Enforcement, Food and Drug Administration, Washington, D.C., were on brief, for plaintiff, appellant.

Dale B. Hinson, Washington, D.C., with whom James D. St. Clair, P.C., James L. Quarles III, Hale and Dorr, Washington, D.C., Manuel A. Guzman, and McConnell, Valdes, Kelley, Sifre, Griggs & Ruiz-Suria, San Juan, P.R., were on brief, for Alcon Laboratories (Puerto Rico), Inc., et al.

Before CAMPBELL, Chief Judge, STEWART,* Associate Justice (Retired), and BOWNES, Circuit Judge.

---

* Of the Supreme Court of the United States, sitting by designation.

1. Pub.L. 75–217, 52 Stat. 1040. The 1938 Act was preceded by the Food and Drugs Act of 1906, 34 Stat. 768. It has been amended on a number of occasions since 1938.

2. Respectively, *see United States v. An Article of Drug (Neo-Terramycin),* 725 F.2d 976, 978 (5th

---

STEWART, Associate Justice (Retired):

In the present appeal this court reviews for a second time proceedings instituted by the federal Food and Drug Administration (FDA) against Alcon Laboratories (Alcon) and its drug "WANS" (Webster's Anti-Nausea Supprettes). *See United States v. Alcon Laboratories,* 636 F.2d 876 (1st Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3005, 69 L.Ed.2d 388 (1981). The issues arise under the Federal Food, Drug and Cosmetics Act of 1938 (the Act), 21 U.S.C. §§ 301–392 (as amended), [1] which provides a statutory structure for the premarketing approval and regulation of drugs that has been described variously as "somewhat complicated," "not straightforward," and even "inconsistent" in its judicial interpretation.[2]

After a seven-day trial in March 1983, a jury answered special interrogatories to the effect that WANS should be exempt from FDA approval because it is currently recognized by experts as safe and effective, and was recognized as safe by experts in 1962. The United States now appeals from that verdict and from the district court's refusal to grant it judgment notwithstanding the verdict (j.n.o.v.).

## I. *The Statutory Structure.*

The Federal Food, Drug and Cosmetic Act was enacted in 1938. It prohibits the introduction of any "new drug" into interstate commerce unless the FDA has approved the drug as "safe and effective." 21 U.S.C. § 355. The statutory definition of "new drug," however, expressly excludes a drug that is

generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective

---

Cir.1984); *United States v. Articles of Food and Drug (Coli-Trol 80),* 518 F.2d 743, 745 n. 1 (5th Cir.1975); *Lemmon Pharmacal Co. v. Richardson,* 319 F.Supp. 375, 378 (E.D.Pa.1970). In light of the complexity of this statutory structure, as well as the paucity of precedent in this Circuit, it is perhaps unsurprising that the district court and the parties acted in some confusion with regard to the law.

for use under the conditions prescribed, recommended, or suggested in the labeling thereof, ... [and if the drug has] been used to a material extent or for a material time under such conditions.

21 U.S.C. § 321(p).

The requirement that a new drug must be "effective" was not part of the 1938 Act. "Effectiveness" was added when Congress amended the Act in 1962 (the 1962 amendments). *See* Pub.L. 87–781, § 102, 76 Stat. 781 (Oct. 10, 1962). A "grandfather clause" in the 1962 amendments specifically exempts from the effectiveness requirements some drugs that were on the market in the United States before the 1962 amendments, if certain conditions are met. *Id.*, § 107(c)(4), *reprinted at* 21 U.S.C. § 321 (note). Because this grandfather clause is central to Alcon's case, we quote it in full:

> In the case of any drug which, on the day immediately preceding the enactment date [i.e., October 9, 1962], (A) was commercially used or sold in the United States, (B) was not a new drug as defined by section 201(p) of the basic Act as then in force, and (C) was not covered by an effective application under section 505 of that Act, the amendments to section 201(p) made by this Act shall not apply to such drug when intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day.

This clause thus sets forth *four* conditions that must have been true as of October 1962 for a drug to be exempt from the Act as amended:

(A) the drug must have been commercially used or sold in this country before 1962;

(B) it must not have been within the definition of a "new drug" in the 1938 Act;

(C) it must not have been covered by an effective new drug application; *and*

(D) it must *currently* be "intended solely for use under conditions" prescribed or recommended in its 1962 labeling.

*See Alcon Laboratories, supra,* 636 F.2d at 879. With regard to condition (B), the Act's definition of a "new drug" before the 1962 amendments was identical to the present definition quoted above (21 U.S.C. § 321(p)), except that "effectiveness" was not included. General recognition by experts for *safety*, however, has been a requirement for exemption from new drug approval procedures since 1938.

Thus the 1962 grandfather clause simply relieved manufacturers of pre-1962 drugs from having to demonstrate the effectiveness of their drugs, so long as the drugs were generally recognized among experts as safe for certain uses in 1962 and no new conditions of use for the drug are suggested by the manufacturer. As Senator Eastland explained in 1962, "[e]stablished drugs which have never been required to go through new drug procedures will not be affected by the new effectiveness test insofar as their existing claims are concerned." 108 Cong.Rec. 17366 (Aug. 23, 1962); *see USV Pharmaceutical Corp. v. Weinberger,* 412 U.S. 655, 664, 93 S.Ct. 2498, 2504, 37 L.Ed.2d 244 (1973). But even drugs that were on the market before 1962 must either have been generally recognized as safe in 1962 or be approved today by the FDA.

II. *Facts and Proceedings Below.*

WANS is a rectal suppository drug sold to alleviate the symptoms (but not the underlying causes) of nausea and vomiting. In medical terms it is an "antiemetic," or anti-vomiting, drug. WANS contains two active ingredients: pyrilamine maleate (an antihistamine) and pentobarbital sodium (a barbiturate). WANS also contains "inactive" ingredients in the wax base that is used to bond together the two active ingredients.[3] WANS is manufactured in three

---

**3.** The WANS label lists only the two active ingredients and the trade name of the wax base ("Neocra"). The wax base makes up 94% of each WANS capsule. The record, but not the WANS label, reveals that the wax base is composed of variations of polyethylene glycol. No

different strengths, two for adults and one for children, and has been sold in this country since 1955 (1956 for the childrens' dosage). It was uncontested at trial that in the decade from 1970–1980, over 4 million persons used WANS.[4]

Although WANS was clearly a "new drug" in 1955,[5] Alcon never submitted it for FDA approval. Commercial sale of WANS proceeded apparently without incident until 1967. In that year, an FDA official came upon a magazine advertisement for WANS which stated that WANS was "completely safe." Characterizing that description as "untrue and misleading," the official recommended that the FDA take some action against the drug. The FDA subsequently wrote to the manufacturer of WANS[6] and "urged" it to "review" the advertising for WANS. The FDA suggested a number of specific changes in WANS's advertising and promotional literature, and after an exchange of further correspondence all these changes were adopted in WANS's promotional materials.[7] In a subsequent letter, the agency notified the manufacturer that the new advertising materials "appear[ed] to be consistent with [the FDA's] suggestions." The letter expressly noted, however, that the FDA's satisfaction with the new WANS labeling "is not to be in any way construed as constituting official approval either as to the safety or efficacy" of WANS.

In 1975, the FDA began to study the possibility of a relationship between the use of "common medications," such as aspirin, and Reye's Syndrome, a serious childhood disease discovered in the early 1960s and still not fully understood. Because sudden vomiting is a symptom of Reye's Syndrome, one of the types of medication that the FDA focused on was antiemetics such as WANS. In 1976, the FDA assembled an ad hoc panel of experts to study "the role of medications in Reye's Syndrome." This ad hoc committee found that the effectiveness of antiemetics was not demonstrated by any existing studies, and noted that there can be health concerns if antiemetics are used in certain circumstances. The ad hoc committee did not come to any firm conclusions about the safety of antiemetic drugs, but the committee did recommend further study by the FDA. In February 1977, a second FDA committee of experts, the Neurologic Drugs Advisory Committee, noted that "there is a safety issue on [the use of] antiemetics in children." After discussion, however, the Advisory Committee also decided only to request "further information" on the issue from the FDA.

Against this background, the FDA notified Alcon on March 17, 1978, that it believed WANS was being sold unlawfully because it had never been subjected to the FDA's "new drug" approval requirements. The FDA stated that it was "unaware of substantial scientific evidence which demonstrates that WANS is generally recognized as safe and effective for the treatment of nausea and vomiting."[8] In re-

---

other information about the ingredients of the wax base appears in the record.

4. The parties have filed excerpts from the record in the district court as a Joint Appendix. In the interests of fairness and completeness, however, all 33 volumes of the record have been reviewed by this court. Factual references in this opinion have been drawn from both the Joint Appendix and the record volumes.

5. As Alcon's expert witness Dr. Crawford stated, WANS "were new drugs to us [practicing physicians] in 1956."

6. WANS was owned and manufactured by the William A. Webster Co. of Tennessee until the 1970s, when WANS was purchased by Alcon Laboratories. Alcon subsequently moved the WANS manufacturing facility to Puerto Rico; hence the venue of these lawsuits.

7. These changes included a complete listing of possible side-effects, precautions, and contraindications for WANS; elimination of all recommended uses except those associated with nausea and vomiting; elimination of the claim that WANS was "preferred by physicians and patients of all ages"; and the addition of a statement that WANS should not be administered to children below the age of six months.

8. The FDA apparently sent identical letters to all manufacturers of antiemetic drugs containing the same active ingredients as WANS. Each letter stated that the FDA's advisory committee had reported that children treated with WANS-

sponse, Alcon claimed that WANS was not a "new drug" as defined in the Act and was therefore exempt from the evidentiary requirements relevant to FDA approval.

Consequently, the FDA sought an injunction against the further distribution of WANS under 21 U.S.C. § 332(a) as a "misbranded" and unapproved "new drug." *See* 21 U.S.C. §§ 331(a) & (d), § 352(f)(1). When its motion for a temporary restraining order was denied, the FDA also instituted four seizure actions against WANS under 21 U.S.C. § 334, and large quantities of WANS were seized pending judgment by the court. The injunction and the four seizure actions were consolidated in the district court without objection from the government. They constitute the five cases that have been consolidated for this appeal.

After some discovery, the district court ruled that the seizures were invalid. It enjoined the FDA from further enforcement action and remanded the issues to the FDA for further consideration. On appeal, however, this court ruled that the federal courts lack jurisdiction to enjoin preliminarily FDA seizure actions properly instituted under the Act. *Alcon Laboratories, supra,* 636 F.2d at 881. The court further held that the district court could not interfere with the FDA's administrative enforcement of the Act against WANS unless and until the district court determined the merits of the FDA's position. *Id.* at 883. Finally, this court stated that "in view of the fact that the FDA's current position on the 'new drug' status of WANS is already clear," there was no justification for remanding the issue to the FDA; rather the district court should proceed toward trial at which "the FDA carries the burden of proving its position." *Id.* at 888. The case was then remanded "for further proceed-

ings consistent with" the opinion. *Id.* at 889.

Alcon's position on the merits throughout this litigation has been twofold. *First,* Alcon contends that WANS is exempt from the efficacy requirements of the 1962 amendments because it fulfills the conditions of the 1962 grandfather clause. Based on this premise, Alcon further contends that WANS was generally recognized by experts as safe in 1962, and is so recognized today, and that WANS is therefore entirely exempt from the Act's premarket approval system for new drugs because it is not a "new drug" under the pre-1962 statutory definition. *Second,* Alcon contends that even if the grandfather clause does not apply, WANS is now generally recognized by experts as safe *and effective* for the suppression of nausea and vomiting, and therefore does not fall within the definition of "new drug" currently embodied in the Act. Thus it is exempt from approval in any case.

The FDA's position is simply the converse of Alcon's. The FDA contends that WANS does not fall within the 1962 grandfather clause because (1) WANS's current labeling suggests use under conditions different from those suggested in October 1962, and (2) WANS was not generally recognized as safe by qualified experts prior to 1962. As for WANS's current status, the FDA argues that Alcon has not tendered the "substantial evidence" required under the Act to demonstrate a general recognition for effectiveness, and that WANS is also not generally recognized as safe today.

Oddly enough, the FDA consented to submit all these issues to a jury for resolution. We do not believe that such a course was required by this court's previous opin-

---

like drugs had "experienced severe and sometimes fatal reactions." This claim was undeniably false. No such report had been made and, in fact, the record indicates that no fatal reactions have ever been associated with WANS. This court referred to this false representation in its prior opinion in this case. 636 F.2d at 879. Alcon understandably made much of this misleading falsehood, once it was discovered.

However, despite our concern over the FDA's practice in this case, this court noted in its previous opinion that the law "precludes judicial interference with the FDA's decision to institute enforcement actions, whatever the precise context." *Id.* at 882. The FDA has now admitted its error, and Alcon must defend its position under the statute on the merits, regardless of the FDA's pre-enforcement allegations.

ion. While the opinion did note the need for a "judicial determination," 636 F.2d at 883, and referred to the need for a "trial", *id.* at 888, 889, it seems clear that a number of issues could and should have been resolved by the district court judge as a matter of law based on undisputed facts. *See* Fed.R.Civ.P. 50 & 56. For example, the labeling issued for WANS between 1962 and 1983 is undisputed; whether the differences in labeling are significant under the terms of the 1962 grandfather clause is purely a question of law, not fact. Likewise, the government might have sought judgment as a matter of law as to its claim that any "genuine dispute" between qualified experts is enough to preclude a finding of "general recognition" of safety or efficacy. *See* note 22, *infra.* Despite sharp and obvious differences between the FDA and Alcon regarding the proper interpretation of the law governing this case, however, the government never filed a motion for summary judgment.[9]

At trial, the parties stipulated that WANS was not covered by an effective new drug application before the 1962 amendments, and that WANS had been marketed in the United States since 1955. The issues tried were thus limited to differences between WANS's labeling in 1962 and 1983, and the "general recognition among experts" of WANS's safety prior to 1962 and of WANS's safety and effectiveness in 1983. Testimony on these issues was largely a battle of experts. After all the evidence was submitted, the FDA moved for a directed verdict, contending that "it is the government's position [that] there is no factual issue to be decided by

the jury in this case." This motion was denied by the district judge.

Thus the case went to the jury with instructions to answer four questions: was WANS generally recognized as safe by qualified experts prior to the 1962 amendments?; is WANS so recognized as safe today?; is WANS currently intended for use under the same conditions as in 1962?; and is WANS generally recognized as effective today by qualified experts? The first three questions went to applicability of the grandfather clause; the last question was designed to settle WANS's status today if the grandfather clause was found inapplicable. The jury answered each question in the affirmative, and the court accordingly granted judgment for Alcon.[10] The FDA's subsequent j.n.o.v. motion was denied in a written opinion.

### III. *The Role of the Jury in New Drug Cases.*

Immediately prior to submission of this case to the jury, the FDA moved for a directed verdict on the grounds that, in light of the statutory structure and all the evidence adduced by both sides, there was no issue of fact left for the jury to decide. Alcon suggests that to accept this position would be tantamount to usurping the jury's historic, constitutional role.[11] Alcon's argument cannot be accepted as a general proposition. Although the jury's role in determining disputed facts cannot be denied in a "new drug" case such as this, neither should a jury be asked to decide issues that are of a legal, not factual nature.

#### A. *Right to Trial by Jury*

▮ When injunctive relief and seizure of drugs are sought together in an FDA

---

**9.** In addition, the government submitted proposed special interrogatories for the jury to answer on each of the disputed issues, which did not differ substantially from the interrogatories actually employed by the court.

**10.** The district court's judgment did not include an order that Alcon's seized drugs be returned to Alcon. Alcon subsequently filed in the district court what it termed a motion to amend the judgment to effect such a return, and asked this court to dismiss this appeal pending action on that motion. On December 28, 1983, this

court ruled that the motion was in effect a request for a post-judgment order and, consequently, that it did not affect this court's appellate jurisdiction. *See* Fed.R.App. 4(a)(4). As far as the record reveals, the district court has not acted on Alcon's motion for return of its property, and the four seizure orders are still in effect.

**11.** This position was also alluded to by the district judge in his opinion rejecting the FDA's j.n.o.v. motion.

"new drug" action, it is apparent that the drug manufacturer has a right to have certain issues decided by a jury. An action for an injunction under 21 U.S.C. § 332(a) is, of course, purely equitable in nature, and a jury trial on the injunction alone would not be required under the Seventh Amendment. *United States v. Ellis Research Laboratories, Inc.*, 300 F.2d 550, 554 (7th Cir.), *cert. denied*, 370 U.S. 918, 82 S.Ct. 1558, 8 L.Ed.2d 499 (1962); *see United States v. Louisiana*, 339 U.S. 699, 706, 70 S.Ct. 914, 917, 94 L.Ed. 216 (1950). But in this case the FDA also brought four actions for seizure and forfeiture against quantities of WANS under 21 U.S.C. § 334. Section 334(b) expressly provides for a trial by jury of "any issue of fact." Moreover, it is well settled that seizure actions, at least on land, are actions at law guaranteed a jury trial under the Seventh Amendment. *C.J. Hendry Co. v. Moore*, 318 U.S. 133, 153, 63 S.Ct. 499, 510, 87 L.Ed. 663 (1943). The government did not object to consolidation of the injunction and seizure actions. In any case, the Supreme Court has held that where factual issues are "common" between legal and equitable claims, the right to a jury trial cannot be withheld. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479, 82 S.Ct. 894, 900, 8 L.Ed.2d 44 (1962). Analysis of the instant actions reveals that both might depend ultimately upon determination of the same factual issues: whether WANS was in 1962 and is today generally recognized among qualified experts as safe and (if the grandfather clause does not apply) effective.[12] Thus Alcon

had the right to go before a jury on genuinely disputed factual questions.[13]

### B. *Role of the Jury.*

Although the right to a jury trial in a case may be clear, that right is never all-encompassing. "It is, of course, a fundamental of the jury trial ... that the jury acts, not at large, but under the supervision of a judge." *United States v. Taylor*, 464 F.2d 240, 242 (2d Cir.1972) (citation omitted). Under the Federal Rules of Civil Procedure, a district court judge has both the right and the duty to determine prior to submitting a case to a jury whether there exist material issues of fact that are genuinely disputed. *See* Fed.R.Civ.P. 56(c). "A factual dispute is material if it 'affects the outcome of the litigation,' and genuine if manifested by 'substantial' evidence 'going beyond the allegations [of the party opposing judgment.]'" *Pignons S.A. de Mecanique v. Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir.1981). Thus upon proper pre-trial motion a trial judge must carefully sift the evidence submitted by all parties to determine whether disputes are factual (as opposed to legal) and "genuine," and then further review and interpret relevant statutes, to see if any genuine factual dispute is "material" to the merits of the case.

Even after evidence has been presented to the jury, a judge must carefully review all the evidence before submitting the case for the jury's consideration, and determine whether each party has ad-

---

**12.** The statutory path to this conclusion is intricate but unmistakable. Section 332(a) permits an injunction to issue to restrain violations under § 331; section 331(d) prohibits the introduction into interstate commerce of any article in violation of section 355. Meanwhile, § 334(a)(1) permits a seizure action to be commenced against any article that may not be introduced into interstate commerce under section 355. Section 355 is therefore common to both types of action. Section 355 declares that no person shall introduce into interstate commerce any "new drug" without prior FDA approval. The definition of "new drug," found in § 321(p) which we have quoted in relevant part at page 107, *supra*, excludes drugs that are "generally recognized among experts" as safe and effective. The 1962 grandfather clause,

also quoted *supra* at page 2, includes the identical phrase. Thus "general recognition among experts" can be a factual issue material to the injunctive claims as well as the seizure actions. *See infra*, note 22.

**13.** Whether a finding made by a trial judge in a non-jury injunction proceeding that a drug is a "new drug" under section 355 could ever be *res judicata* for purposes of a subsequent seizure action presents an interesting question that we need not decide in this case. *Cf. Neo-Terramycin, supra* note 2, 725 F.2d at 984 ("new drug" finding made by a jury in a seizure action would be "*res judicata* in a subsequent injunction action").

duced evidence sufficient to warrant a verdict in its favor. If the court finds that such is not the case, it may grant a directed verdict without asking the jury for findings. *See* Fed.R.Civ.P. 50(a); *Brady v. Southern Railway Co.*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943). Finally, even after a jury has rendered a verdict, if the trial court decides after careful reconsideration that the evidence was insufficient to submit the case to the jury after all, it has the power to grant a judgment *non obstante veredicto* and reverse the jury's verdict. Fed.R.Civ.P. 50(b). The exercise of the judicial prerogative to terminate a case must be painstaking. Nevertheless, whether there exist factual questions sufficiently disputed to warrant a verdict for either side is an issue of law, not fact, and its determination is quintessentially the function of the trial judge, not the jury.

■ Because of the constitutional status of the right to trial by jury, exercise of the judicial power to terminate a case is also subject to a stringent standard of review. Thus a directed verdict can be ordered only when,

> viewing the evidence in the light most favorable to [the party opposing the motion, the court] find[s] that, "without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there is only one verdict reasonable men could reach."

*Trinidad v. Pan American World Airways, Inc.*, 575 F.2d 983, 984 (1st Cir.1978), *quoting Harrington v. United States*, 504 F.2d 1306, 1311 (1st Cir.1974). The standard for reviewing a judgment n.o.v. is similar if not identical: "The motion is properly granted only when, as a matter of law, no conclusion but one can be drawn." *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 990 (1st Cir.1978); *accord, Robinson v. Watts Detective Agency*, 685 F.2d 729, 733 (1st Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 and 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983). Nevertheless it should be clear that, while special defer-

ence is due the verdict of a civil jury, "nothing in the Seventh Amendment removes the appellate court's duty to correct errors of law." *Ballwanz v. Isthmian Lines, Inc.*, 319 F.2d 457, 460 (4th Cir. 1963), *cert. denied*, 376 U.S. 970, 84 S.Ct. 1136, 12 L.Ed.2d 84 (1964). Thus, in a "new drug" case as in any other, the trial court as well as this court has an obligation to render judgment as a matter of law when it is clear from the evidence that such is required.

## IV. *Merits on Appeal.*

■ Upon careful consideration of the Act, its purposes and legislative history, and the evidence submitted at trial by both parties, we have concluded that the FDA's motion for a directed verdict should have been granted in this case. As a matter of law the evidence was insufficient to ask the jury to consider whether WANS is or was "generally recognized among experts" as safe or effective, because certain evidentiary requirements under the Act simply were not fulfilled. This conclusion applies to Alcon's showing under the 1962 grandfather clause as well under the current Act.

### A. *The 1962 Grandfather Clause.*

■ If WANS meets the conditions of the grandfather clause, *see supra*, pp. 107–108, then it is exempt from the current effectiveness requirements. We therefore consider this issue first. We note at the outset that, as an exemption to a comprehensive regulatory statute concerned with public safety, the grandfather clause is to be strictly construed, and Alcon bears the burden of proof as to each condition. *See United States v. Allan Drug Corp.*, 357 F.2d 713, 718 (10th Cir.), *cert. denied*, 385 U.S. 899, 87 S.Ct. 203, 17 L.Ed.2d 131 (1966); *United States v. An Article of Drug (Bentex Ulcerine)*, 469 F.2d 875, 878 (5th Cir.1972), *cert. denied*, 412 U.S. 938, 93 S.Ct. 2772, 37 L.Ed.2d 397 (1973).

#### 1. *Labeling*

The grandfather clause provides that a pre-1962 drug will not be exempt from the

1962 amendments unless it is currently "intended solely for use under conditions prescribed, recommended, or suggested in labeling" of the drug prior to 1962. "Labeling" is broadly defined in the Act (21 U.S.C. § 321(m)):

> The term "labeling" means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.

Prior to trial the parties stipulated as to what documents constituted "labeling" for WANS prior to 1962 and at the time of trial. Thus all the facts material to the labeling issue were undisputed,[14] and the only issue to be resolved was one of law for the court, applying the statutory language "intended solely for use under conditions." This issue simply was not one of fact for the jury to decide.[15]

Pre-1962 labels suggest a number of uses for WANS other than suppression of nausea and vomiting. These other uses were eliminated from WANS labels in 1967 after the FDA took issue with them. The FDA contends that this change alone requires judgment against Alcon on this issue; the FDA's position is that pre-1962 and current labeling must be "exactly the same" for the grandfather clause to apply. *See United States v. 1,048,000 Capsules (Afrodex)*, 347 F.Supp. 768, 770 (S.D.Tex. 1972), *aff'd*, 494 F.2d 1158 (5th Cir.1974); *Allan Drug Corp., supra*, 357 F.2d at 719 (labeling must "contain[ ] the same representations concerning its use").

Alcon, however, cites legislative history of the grandfather clause to the effect that the 1962 amendments were intended to address only "new uses" of existing drugs. *See, e.g.* S.Rep. No. 1744, Part 1, 87th Cong., 2d Sess. 17 (July 19, 1962), U.S.Code Cong. & Admin.News 1962, pp. 2884, 2893 ("Any such new use would have to be submitted" for FDA approval); S.Rep. No. 1744, Part 2, 87th Cong., 2d Sess. 8 (Aug. 21, 1962) ("existing claims will be exempt"); 108 Cong.Rec. 17,366 (Aug. 23, 1962) (remarks of Sen. Eastland) (same). Since WANS was recommended for the suppression of nausea and vomiting in 1962 and is so recommended today, Alcon asserts that the labeling condition of the grandfather clause is satisfied.

Alcon dropped the other suggested uses for WANS in 1967 after the FDA evinced some concern about the safety of those uses. An argument can be made that such voluntary relabeling to eliminate questionable uses of an unapproved drug is to be encouraged, and that the literal language of the grandfather clause does not require that such corrective relabeling operate to transform old drugs into "new" ones requiring FDA approval. *See Allan Drug Corp., supra*, 357 F.2d at 721 (Seth, J., dissenting) ("It would seem that the purpose of the Act is to encourage label corrections rather than to discourage them.") We need not decide this issue in the present case, however, because it is clear from the stipulated labeling that the "con-

---

**14.** Alcon now suggests that certain file cards distributed to physicians to promote WANS in 1961 do not constitute "labeling" for purposes of the grandfather clause. Even if Alcon had not stipulated to the contrary, we would find otherwise. The Supreme Court has ruled that labeling under this same statutory provision includes any literature that "supplements or explains" a drug, including "advertising or descriptive matter"—"[n]o physical attachment one to the other is necessary." *Kordel v. United States*, 335 U.S. 345, 350, 69 S.Ct. 106, 110, 93 L.Ed. 52 (1948). In light of the normal rule that "safety legislation is to be liberally construed to effect the congressional purpose," *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13, 100 S.Ct. 883, 891, 63 L.Ed.2d 154 (1980), Alcon's argument on this point is frivolous.

**15.** Alcon's witness Dr. Crawford, an experienced pediatrician who has prescribed WANS for his patients since 1956, testified that in his opinion WANS is currently intended for use under the same conditions found in the 1962 labeling. Because this is a legal issue and not a medical question, Dr. Crawford was not qualified to offer this opinion, and his testimony on the subject was irrelevant. The same applies to the FDA's misguided attempts to have its own medical experts address the question. For similar reasons, the correspondence between the FDA and WANS's manufacturer indicating the FDA's satisfaction with WANS's labeling in 1967 is irrelevant to this issue. The WANS labeling speaks for itself.

ditions" for use of WANS suggested specifically in connection with vomiting and nausea have changed significantly since 1962.

It must be noted that the operative term in the statutory language appears to be "conditions," not "use." We read the language to mean that even if particular *uses* of a drug are the same, a change in the suggested *conditions* for its use will suffice to remove the drug from the protection of the grandfather clause. Current WANS labeling states that "WANS is indicated in the symptomatic treatment of nausea and vomiting," without apparent qualification as to cause. Yet the 1962 WANS labeling listed eleven specific types of, or causes of, nausea and vomiting under "indications." Nothing in the record indicates that these eleven causes are the only possible causes of nausea and vomiting, however, and trial testimony revealed that a number of other conditions can cause vomiting. Thus the current WANS labeling suggests that the drug be used for conditions not listed in the 1962 labeling.

Furthermore, in 1962 WANS labeling stated that WANS was "Preferred by ... Patients of all ages" and that "Children ... of all ages tolerate [WANS] exceptionally well". In stark contrast, current WANS labeling states, apparently in bold print, "Do not use in infants below the age of 6 months." It further indicates that WANS is "not recommended for treatment of uncomplicated vomiting in children and ... should be limited to prolonged vomiting of known etiology [i.e., cause]." The labeling goes on to discuss the "suspicion" of a link between drugs like WANS and Reye's Syndrome, the same concern that led the FDA to bring this action. Thus it appears that the suggested "conditions" for use of WANS in children have changed dramatically since 1962. We do not view this labeling change as simply a minor correction of possibly erroneous claims. Instead, it indicates that new information about the health effects of WANS has become available since 1962, information that Alcon apparently considers reliable enough to include on its labels. This new information,

and WANS's changed labeling, indicate that the "existing claims" made for WANS with regard to nausea and vomiting in 1962 are no longer accurate. The general purpose of the Act to protect the public's health and safety would be ill-served if such new labeling information had no effect on an unapproved drug's regulatory status. The new conditions now suggested for use of WANS in the treatment of nausea and vomiting are sufficient to take WANS out of the grandfather clause and place it squarely within the requirements of the Act as amended.

### 2. *Lack of Scientific Testing.*

Even if WANS met the labeling condition of the grandfather clause, the clause would still be inapplicable as a matter of law, because Alcon has produced absolutely no scientific testing evidence of WANS's safety in 1962. We believe it clear as a matter of statutory interpretation that at least some scientific drug testing for safety must have been performed prior to 1962 to fulfill the general recognition requirement of the grandfather clause.

■ Section 505(b) of the 1938 Act required that drug manufacturers submit "as part of the [new drug] application (1) full *reports of investigations which have been made* to show whether or not such drug is safe for use." Pub.L. 75–717, § 505(b) (codified as subsequently amended at 21 U.S.C. § 355(b)) (emphasis supplied). Section 505(d) went on to provide that the new drug application "shall" be disapproved if "the investigations [required by § 505(b) ] ... do not include *adequate tests by all methods reasonably applicable* to show whether or not such drug is safe for use" (emphasis supplied). Explaining § 505(b), the 1938 House Report stated that "new drugs [are] to be adequately tested," and referred to "laboratory and clinical tests" and "the manufacturer's tests." H.R.Rep. No. 2139, Part 1, 75th Cong., 3rd Sess. 9 (April 14, 1938). In addition, the contemporary administrative interpretation of the provision reflects the requirement of "sci-

entific studies." *See* Sellers & Grundstein, *Administrative Procedure and Practice in the Department of Agriculture under the Food, Drug, and Cosmetic Act of 1938,* at 92 (1940), *reprinted in* H. Toulmin, Jr., *The Law of Food, Drugs and Cosmetics* § 411 (1st ed. 1942). In this contemporary monograph written by an attorney and a staff member in the Department of Agriculture (the department responsible for the FDA in 1940), the authors state with regard to § 505(b) that "[t]he Administration insists upon a certain amount of empirical, clinical testing on humans before it will regard a new drug as safe." *Id.* at 93. General publication of such studies does not seem to have been required, but the requirement of some valid testing is clear: "In rendering a decision that a drug is safe, . . . the Administration will accept any valid tests, regardless of source, . . . so long as they can be shown to have scientific validity." *Id.*[16] In addition to the plain language of sections 505(b) and (d) of the 1938 Act, great deference is due the contemporary interpretation given to the Act by those originally charged with its administration. *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978).

Alcon argues that the evidentiary standards for new drug applications under § 505 are not applicable in a case where the very claim at issue is that no new drug application is required because WANS in 1962 was not a "new drug" as defined in § 201(p) of the 1938 Act. This argument is foreclosed, however, by the Supreme Court's reasoning in *Weinberger v. Hyn-*

*son, Wescott & Dunning, Inc.,* 412 U.S. 609, 628–32, 93 S.Ct. 2469, 2482–84, 37 L.Ed.2d 207 (1973). In *Hynson,* a drug manufacturer argued that the "substantial evidence" standard for proof of effectiveness found in § 505 of the Act was not applicable to the requirement for demonstrating the general recognition of effectiveness referred to in the "new drug" definition of § 201(p). Thus *Hynson* involved the precise question that at issue here: should the requirements for new drug applications be read into the definitional requirements for "new drugs" under the Act? The Court rejected the position which Alcon advocates (412 U.S. at 631, 93 S.Ct. at 2484)[17]:

> [W]e cannot construe § 201(p) to deprive FDA of jurisdiction over a drug which, if subject to FDA regulation, could not be marketed because it had not passed the "substantial evidence" test. To do so "would be to impute to Congress a purpose to paralyze with one hand what it sought to promote with the other." *Clark v. Uebersee Finanz-Korp.,* 332 U.S. 480, 489 [68 S.Ct. 174, 178, 92 L.Ed. 88] [1947].

In a companion case to *Hynson,* the Court succinctly explained its holding: "the reach of scientific inquiry [for effectiveness] under both § 505(d) and § 201(p) is precisely the same." *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 653, 93 S.Ct. 2488, 2494, 37 L.Ed.2d 235 (1973). Likewise, "the reach of scientific inquiry" required for safety under

---

**16.** Thus the FDA's argument that a pre-1962 general recognition of safety must be based upon *published* investigations meeting *current* standards for scientific validity is not well-taken. Pre-1962 recognition need meet only the standards for scientific validity as they were understood at that time, and general publication evidently was not required. The Supreme Court's decision in *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) is not to the contrary. That opinion set forth only the requirements for effectiveness under the 1962 amendments. As has been noted, the requirements for demonstrating efficacy and those for safety under the Act "are governed by different sections of the

law, different legislative histories and different regulations." *Hess & Clark, Division of Rhodia, Inc. v. Food & Drug Admin.,* 495 F.2d 975, 985 (D.C.Cir.1974); *see also E.R. Squibb & Sons v. Weinberger,* 483 F.2d 1382, 1385 (3rd Cir.1973).

**17.** Alcon is correct that the *Hynson* case specifically involved only the evidentiary requirements for demonstrating effectiveness under the 1962 amendments, and not those for safety. *See* note 16, *supra.* This fact, however, provides no justification for ignoring the Court's reasoning with regard to statutory construction of the Act and the specific relationship between sections 201(p) and 505.

§§ 505(d) and 201(p) should also be "precisely the same," and the safety of a pre-1962 drug must be demonstrated by some sort of contemporaneous, valid scientific tests for the grandfather clause to be fulfilled.[18] It would be anomalous to hold that Alcon could now avoid the full weight of the burden to demonstrate safety that it would have had to satisfy in 1955 (when WANS clearly was a "new drug") simply because Alcon marketed WANS for seven years without seeking FDA approval.

It is undisputed that there is no evidence of any scientific testing of WANS for safety prior to 1962. Thus, as a matter of law, Alcon's evidence was insufficient to support a finding of "general recognition of safety" prior to 1962. *See United States v. 41 Cases, More or Less,* 420 F.2d 1126, 1130 (5th Cir.1970). The FDA's motion for a directed verdict on the grandfather clause questions therefore should have been granted.

B. *The Current Status of WANS.*

Because the 1962 grandfather clause does not apply to WANS as a matter of law, WANS must meet the requirements of the Act as currently in force. Alcon contends that even under the current Act, WANS is exempt from FDA approval because it is now "generally recognized among experts ... as safe and effective." 21 U.S.C. § 321(p). It is true that the jury found affirmatively for Alcon on those issues. But, again, the record requires the conclusion that the factual questions of "general recognition" should not have been submitted to the jury in the first place,

because Alcon failed to introduce the type of "substantial evidence" of effectiveness required by the Act as a matter of law.

Under the *Hynson* decision, *supra,* the evidentiary standards for effectiveness required for a new drug application under 21 U.S.C. § 355(d) must also be applied to any drug for which "general recognition of effectiveness among experts" is claimed under § 321(p). Section 355(d)(5) requires that an application be rejected if the FDA finds a "lack of substantial evidence that the drug will have the effect it purports or is represented to have." Substantial evidence is defined in the same subsection as "evidence consisting of *adequate and well-controlled investigations,* including clinical investigations, [conducted] by experts...." (emphasis supplied). WANS's claimed effectiveness must be supported with evidence of this kind for it to obtain exemption from new drug approval requirements today.

Alcon concedes that no investigations of any kind have ever been conducted to test WAN's efficacy. But at trial it successfully introduced three studies conducted in 1968 and 1969 using a drug called Emeserts.[19] Emeserts is an antiemetic like WANS which contains the same amounts of the same active ingredients found in WANS. There is no evidence in the record concerning the "inactive" ingredients in either drug. *See* note 3, *supra.* Alcon's theory is that WANS and Emeserts are, in effect, the same drug, and that the Emeserts studies were "adequate and well-controlled investigations" within the meaning of § 355(d). Thus Alcon argues that the

---

**18.** We recognize that Alcon depends on application of the "general recognition" language of the 1962 grandfather clause, while we have interpreted that same language in § 201(p) of the 1938 Act. There is no logical reason to believe that the identical language was intended by Congress to have different meanings in those two contexts, however, and we conclude that their meaning is the same.

**19.** The FDA contends that admission of these studies violated Fed.R.Evid. 803 (18). That rule bars the introduction of "learned treatises" upon which an expert has relied (although the text may be read to the jury), in order to prevent

"misunderstanding and misapplication" of principles contained in the treatises by the jury "without expert assistance and supervision." *Id.* (Notes of the Advisory Committee). At trial, however, counsel for the FDA refused to stipulate that the three studies even existed, stating at the time it could not stipulate to their existence while maintaining an objection to their relevance. Such a position is erroneous. In light of the FDA's refusal to stipulate that the studies existed, we do not find the district court's limited admission of the studies to prove that fact to be in error.

Emeserts studies may be considered as evidence that demonstrates WANS's effectiveness.

The testimony of one of Alcon's experts, Dr. Kalman, was directed largely to this issue. Dr. Kalman had never personally examined WANS or Emeserts by chemical or other scientific means; he based his testimony simply on his reading of the drug products' labels (including their lists of ingredients) and some other, unspecified "information furnished to [him] by Alcon." He then offered his theoretical opinion that the clinical effects of Emeserts and WANS would be "identical or nearly so," although the drugs "may not be identical in terms of" their inactive ingredients.

■ There are a number of reasons why this testimony is insufficient as a matter of law to support application of the Emeserts test results to an evaluation of WANS. *First*, there is precedent for rejecting an expert's "theoretical evaluation" of a drug. *United States v. 7 Cartons, More or Less (Ferro-lac)*, 293 F.Supp. 660, 666 (S.D.Ill.1968), *aff'd in part and vacated in part*, 424 F.2d 1364 (7th Cir.1970). We doubt that a review of a drug product's label and unrevealed "information" supplied by the interested drug company is sufficient foundation on which to base an expert opinion as to the clinical effects of two drugs. This is especially true where, as here, the WANS label does not even reveal the chemical makeup of the wax base of the drug. *See* note 3, *supra. Second,* Dr. Kalman did not testify that Emeserts and WANS are bioequivalent; he qualified his testimony by stating that the drugs were identical "or nearly so." It is well recognized that so-called inactive ingredients "may affect the rate at which the active ingredient is delivered." *United States v. Generix Drug Corp.,* 460 U.S. 453, 455, 103 S.Ct. 1298, 1300, 75 L.Ed.2d 198 (1983). Indeed, there was unrebutted trial testimony in this case to the effect that WANS's wax base may contribute to the "erratic absorption" of its active ingredients, which in turn can result in health dangers due to an oversupply of the active ingredients in the bloodstream. In the absence of any expert testimony specifically addressing the inactive ingredients in the two drugs, bioequivalence of Emeserts and WANS was, as a matter of law, not demonstrated.[20]

The deciding factor on this issue, however, is that even if the Emeserts studies could be substituted as evidence of WANS's effectiveness, the testimony of Alcon's own expert leads to the unavoidable conclusion that those studies were not the sort of "adequate and well-controlled investigations" required by § 355(d). Alcon's witness Dr. Brown, who was qualified by the district court as "an expert in statistics and clinical trials," testified that the Emeserts studies were comparable to "other papers [published] during that era [i.e., the late 1960s]," but that they "did, for the most part, fail to use some of the methods that most recently ... have come to be

---

**20.** Even if Emeserts and WANS had been shown to be bioequivalent, it is still an open question "whether two demonstrably bioequivalent products, containing the same active ingredients but different [inactive ingredients], might under some circumstances be the same 'drug'" for purposes of the Act. *Generix, supra,* 460 U.S. at 461, 103 S.Ct. at 1302. We are especially reluctant to conclude that evidence concerning inactive ingredients is unnecessary under the Act in light of the historical fact that it was an allegedly inactive ingredient in "Elixer of Sulphanilamide" that caused fatalities in 1937 and led directly to enactment of the 1938 Act in its present form. *See 5 A Legislative History of the Federal Food, Drug, and Cosmetic Act and Its Amendments* 885–897 (U.S. Dept. HEW 1979) (report to the Senate from the Secretary of Agriculture on

"Deaths Dues To Elixer Sulphanilamide") (Nov. 25, 1937). *Cf. Generix, supra,* 460 U.S. at 459, 103 S.Ct. at 1301 (the term "drug" in the Act means "entire drug products, complete with active and inactive ingredients").

The Second Circuit has suggested that it is improper for the district court to engage in the scientific inquiry required to determine whether two drugs are "theraputic equivalents." *Premo Pharmaceutical Laboratories, Inc. v. United States,* 629 F.2d 795, 803 (2d Cir.1980). The court noted that "the entire statutory scheme envisages that the FDA will perform the difficult task of investigation and scientific evaluation usually required" under the statute. *Id.* We do not decide in this case whether or not the issue of bioequivalence can ever be one for the court to decide.

regarded as more important in the [design] of clinical [investigations]." [21] Because Alcon has chosen not to submit a new drug application for WANS in the past, however, it is subject to the effectiveness standards employed by experts today, not 15 years ago. In light of the testimony of Alcon's own expert that the Emeserts studies did not meet present-day standards for "adequate and well-controlled investigations," and considering all the other evidence on this issue in the record, it is clear as a matter of law that Alcon failed to produce the types of studies required to demonstrate "substantial evidence" of effectiveness.

For all these reasons, the Emeserts studies could not and should not have been applied to WANS in this case. As a matter of law, therefore, Alcon failed to meet the "substantial evidence" requirement of § 355(d). Thus it was premature and unnecessary to submit to the jury any question of WANS's "general recognition among experts" for effectiveness; Alcon's preliminary evidence required by the statute on this issue was legally insufficient to create an issue for the jury. Consequently,

the FDA's motion for a directed verdict on the question of current recognition of effectiveness should also have been granted.

## V. *Conclusion.*

A careful and thorough review of all the evidence submitted at trial, evaluated in light of the language, purposes and history of the Act, yields certain unmistakable conclusions. *First,* no pre-1962 studies concerning WANS's safety were submitted at trial, and the stipulated labeling materials for WANS demonstrate a significant change in the conditions for WANS's use since 1962. *Second,* the scientific studies submitted at trial to demonstrate WANS's general recognition of effectiveness fail to meet the minimal statutory requirements for "substantial evidence." These conclusions, which are clear as a matter of law based on undisputed facts, pretermit the need for a factual inquiry into the "general recognition among experts" of WANS's safety and effectiveness.[22] Based upon the foregoing, we conclude that "as a matter of law, no other conclusion but one can be drawn" from all the evidence presented at trial. *Austin v. Unarco Industries, Inc.,* 705 F.2d 1, 17 n. 9 (1st Cir.1983). That

21. Dr. Brown also noted that one Emeserts test method has "long been discredited," and he conceded that a number of design features recommended in his own 1977 textbook for inclusion in the design of biomedical studies were not included in the design of the Emeserts studies. Dr. Brown's testimony on this issue was corroborated by that of the FDA's expert Dr. Tolman, who testified extensively as to why the Emeserts studies were not "adequate and well-controlled."

22. Because the statutory prerequisites were not fulfilled as a matter of law in this case, we do not reach the argument advanced by the FDA that a "genuine conflict" between the testimony of expert witnesses in a new drug trial is sufficient to mandate judgment for the FDA on the issue of "general recognition." Interpretation of the "general recognition among experts" standard has troubled trial and appellate courts for some time, because "the Act ... nowhere defines what constitutes 'general recognition' among experts." *Hynson, supra,* 412 U.S. at 629, 93 S.Ct. at 2483. Although the question of general expert recognition may clearly be a factual one at some level, *see, e.g., Neo-Terramycin, supra,* 725 F.2d at 985; *United States v. An Article of Food,* 622 F.2d 768, 771 (5th Cir.1980); *United States v. Articles of Drug (Quick-O-Ver),* 274 F.Supp. 443, 448 n. 7 (D.Md.1967), not every

conflict in expert testimony is sufficient to create a question for the jury. *See, e.g., Premo, supra,* 629 F.2d at 803 (no general recognition when there is a "severe conflict" in expert testimony); *United States v. X-Otag Plus Tablets,* 441 F.Supp. 105, 114 (D.Colo.1977) (same when there is a "sharp difference of opinion"), *aff'd in relevant part,* 602 F.2d 1387 (10th Cir.1979); *United States v. Article of Drug (Mykocert),* 345 F.Supp. 571, 575 (N.D.Ill.1972) (same when there is "more than a 'mere' conflict" in expert testimony). The congressional purpose of removing the complex medical and scientific aspects of drug disputes from the courts to the expert province of the FDA would be frustrated if any and every divergence in expert opinion could serve to send a new drug case to the jury. It is by now clear that unanimity among experts is not required to demonstrate "general" recognition. *Coli-Trol, supra,* 518 F.2d at 746; *Quick-O-Ver, supra,* 274 F.Supp. at 448 n. 7. Nevertheless, we agree that "the cited cases ... require a discriminating analysis of the [expert testimony] submitted by the parties to determine whether there really is a triable issue as to general recognition." *Lemmon Pharmacal, supra,* 319 F.Supp. at 378.

conclusion is that WANS is subject to the current Act as amended in 1962, that it is not now generally recognized among qualified experts as safe and effective, and that it is a new drug subject to the requirements of 21 U.S.C. § 355. Accordingly, the judgments in the five cases before us are reversed, and the district court is directed to enter judgments consistent with this opinion.